OPINION OF THE COURT
Gloria Cohen Aronin, J.
Plaintiff brought this action against the defendant to recover $4,030.92 for the alleged wrongful appropriation of unmetered gas and $369.93, allegedly constituting a balance due on metered gas.
The answer consists of a general denial, affirmative defenses of payment and Statute of Limitations and á counterclaim alleging the improper shutdown of gas service by plaintiff and failure and refusal to restore, and that defendant’s resultant actual damages were $312,000. It also contains a demand for $936,000 in punitive damages.
The action was tried before the court without a jury.
FINDINGS OF FACT
Defendant MacGregor’s Custom Coach, Inc., was a customer of Brooklyn Union Gas for service to 1700 Eastern *288 Parkway, Brooklyn, New York, during the period in question here, although Brooklyn Union Gas’ records still showed the name of a predecessor corporation. For some time prior to April 12, 1978, Brooklyn Union Gas provided service to the defendant at said premises, sent bills to the premises and the bills were regularly paid by the defendant.
Plaintiff’s employee, Mr. Reif, was present on defendant’s premises, 1700 Eastern Parkway, on April 12, 1978 on business unconnected with the events herein. He observed the gas meter not recording any gas usage and believed gas was actually being consumed within the subject premises because the gas space heaters have pilots. He could not actually see the pilots.
There was a gas leak on the premises in connection with a gas heater in the trailer-office, occupying part of the premises. This gas leak was observed by Mr. Reif, Mr. Fauntleroy, another employee of plaintiff and Fire Captain Anthony Adamo, by use of a “Davis Meter” and admitted by Kenneth Boyar, a principal of the defendant corporation.
Mr. Fauntleroy disconnected the meter from the outlet pipe and gas continued to flow out of the outlet pipe. There was much contradictory testimony as to whether he completely disengaged the meter or just loosened it, whether he broke a meter valve in the course of closing it before disconnecting the meter, the amount of time the meter was loosened or disengaged, and the amount of time residual gas would flow from an outlet pipe.
Plaintiff’s employees were denied access to the basement, to which they had a right, until the next day. They shut off the gas service to the premises from the street on April 12, 1978 because of the potential hazards of the gas leak which existed and the bypass which they suspected.
Plaintiff did not sustain its burden of proving the existence of a bypass, i.e., an illegal connection between gas pipes bypassing the meter. Plaintiff produced no witnesses who saw the bypass. All witnesses agreed that at least part of the bypass had to be in the basement. Subsequent observations of the basement by witnesses for both sides did not establish that a bypass had been there and been *289 removed. The testimony ranged from that showing no disturbance to the pipes, to testimony showing “some pipes looked newer” to testimony establishing that the presence and removal of a bypass was a possibility with the use of certain tools.
While plaintiff introduced expert testimony to the effect that the residue of gas from the. outlet pipe on “dropping” the meter could only be explained by the existence of a bypass, other witnesses raised grave questions as to whether the facts on which the expert testimony was based were in fact accurate.
The court specifically finds that plaintiff’s serviceman, Mr. Fauntleroy, broke the meter valve in attempting to close it just before disengaging the meter. Plaintiff did not establish that the gas coming out of the outlet pipe could not have been caused by the broken valve.
Plaintiff made no attempt to prove that after the restoration of gas, admittedly without any bypass, defendant’s gas consumption, as recorded on the meter, increased.
Thus, in spite of plaintiff’s valiant attempt to prove the existence of a bypass by circumstantial evidence, much of it contested with equal vigor by the defendant, plaintiff’s proof fell short of the required preponderance.
Plaintiff did not establish that it communicated the amount it deemed due for unmetered gas, to wit $4,030.92, to defendant, the payment of which it required for restoration of service, before October of 1978. There did not appear to be any written communication of such an amount, which it seems to this court would be the usual practice and there was no clear evidence of any oral communication either. In fact, the only written communication in evidence is a Brooklyn Union Gas speedgram dated October 10, 1978, stating that gas service would be restored upon payment of $383.64 and a security deposit.
The court specifically finds, however, that no substantial effort was made by defendant to effect restoration of service until September of 1978.
Defendant’s employee, upon attempting to effectuate restoration of service by compliance with the Brooklyn Union Gas speedgram in October, 1978, learned of the *290 plaintiff’s demand for $4,030.92 for alleged use of unmetered gas.
Apparently some attempt was made by the defendant to get service restored after that time without payment of the said amount for unmetered gas, including a complaint to the Public Service Commission on or about November 30, 1978. The court finds, however, that defendant did not offer to put that sum in escrow prior to bringing a court proceeding.
Defendant retained an attorney, who, by order to show cause dated December 4,1978, commenced a proceeding for a preliminary injunction to compel plaintiff to restore gas service. The order to show cause was returnable on December 8, 1978, on which date the parties entered into a stipulation providing that $4,030.92 would be placed in escrow by defendant with its attorney, pending determination of this lawsuit, and a security deposit of $765 would be made by defendant herein to plaintiff herein, and upon compliance plaintiff would restore gas service, with a possible delay of two to three weeks.
Defendant complied with the stipulation. Plaintiff connected the gas to the building on December 18, 1978, and after many calls, installed a new meter and valve on January 5, 1979. On that same date, Mr. Reif of Brooklyn Union Gas tagged several violations in defendant’s system, although plaintiff had never before notified defendant of them. Defendant corrected the problems. On January 9, 1979, Reif tagged one more violation and signed off on all the others. This last violation was corrected and plaintiff finally restored service on January 12, 1979.
With regard to plaintiff’s demand for $369.93, allegedly constituting a balance due on metered gas, the evidence clearly established that defendant paid that balance, although plaintiff somehow failed to note it on its records.
Defendant sustained damages by reason of plaintiff’s failure to provide and/or restore gas service to the premises within a reasonable time in the loss of a subtenant and the loss of certain business.
CONCLUSIONS OF LAW
Plaintiff was justified in discontinuing defendant’s gas service on April 12, 1978.
*291 The plaintiff utility clearly had the right to access and inspection of its property and appurtenances at the defendant’s premises for any proper purpose. (Public Service Law, § 65, subd 9, par [a].)
Since the inspection revealed a gas leak and created a reasonable suspicion of an illegal bypass, and particularly in view of the fact that plaintiff could not gain access to the basement to further inspect and assess the amount of danger until the next day, it was justified in cutting off gas service without notice on April 12, 1978.
While plaintiff would be required to give notice prior to disconnecting service for nonpayment (Transportation Corporations Law, § 15), plaintiff has an inherent right to do so without notice when conditions indicate that life or property may be endangered. In fact, it has a duty to immediately eliminate potential hazards from gas leaks. (Regulations of Public Service Department, 16 NYCRR 255.72.) In the instant case, the clear presence of some kind of gas leak, the suspicion of a bypass, which expert testimony revealed is in itself hazardous, and plaintiff’s inability to complete its inspection and determine the amount of danger, if any, gave plaintiff the right to cut off gas service without notice.
As heretofore stated, plaintiff did not establish by a fair preponderance of the evidence that there was, in fact, an illegal bypass at 1700 Eastern Parkway on April 12,1978.
Thus, the presumption created by subdivision 6 of section 165.15 of the Penal Law to the effect that proof of an illegal bypass of a meter shall be presumptive evidence that the person who receives the benefit does so with knowledge while it applies in civil cases (S & D Thrift Stores v Con Edison, 55 NY2d 1013) has no application here.
It is also not necessary for the court to determine whether the formula used by plaintiff to determine the amount of money due for unmetered gas is appropriate or whether the question of its appropriateness must be determined by the Public Service Commission under the doctrine of primary jurisdiction as enunciated in Guglielmo v Long Is. Light. Co. (83 AD2d 481).
*292 We shall now explore the duties of a utility company in providing service.
A utility company with a mandate under color of State authority has a duty to supply service to a customer, and any lawful termination of such service, such as for nonpayment of an amount owing, may be accomplished only in accord with due process requirements, with the utility company having the burden to justify its shutoff. (Transportation Corporations Law, § 12; Bronson v Consolidated Edison Co., 350 F Supp 443; Montalvo v Consolidated Edison Co., 110 Misc 2d 24.)
Cases holding that a utility has a “paramount obligation” (see Montalvo v Consolidated Edison Co., supra, at p 33) to the public to provide service and to set up procedures for providing services while disputes concerning moneys due are being resolved, frequently arise in connection with service to residences. However, the raison d’etre for these requirements, to wit: that utilities are monopolies and the customers have no alternative sources of services, is equally applicable to commercial customers.
Section 15 of the Transportation Corporations Law provides that service may be discontinued by reason of nonpayment, but only after five days’ written notice to the customer.
The Public Service regulations clearly set forth the procedure to be followed when there is a dispute as to moneys due for service by gas utilities. Pending an investigation by the utility, service may not be terminated. The customer can only be required to pay that portion of the bill which is undisputed. (16 NYCRR 275.8 [a].) If, after the utility’s investigation, the customer is found to owe the disputed amount, proper five-day notice must be given the consumer, advising him or her of the availability of the Public Service Commission’s complaint-handling procedure. (16 NYCRR 275.8 [b].)
It would appear, therefore, that a continued shutoff of gas when the amount owing is in dispute is in violation of the regulations and the case law. (Bronson v Consolidated Edison Co., supra; see Levine v Brooklyn Union Gas Co., 146 App Div 464.)
*293 The court has heretofore stated that the plaintiff was justified in disconnecting the defendant’s gas service on April 12, 1978. However, that does not give plaintiff the right to indefinitely continue the deprivation of service without notice.
Plaintiff had access to the basement the next day and confirmed that no bypass was present. No gas leak existed in the basement and the minor gas leak under the trailer was easily correctible. Thus, plaintiff’s only possible justification, as alleged by it, for continuing to withhold service was nonpayment. Therefore, plaintiff was required to comply with the notice requirements of the Transportation Corporations Law and the procedures delineated in the regulations. (Transportation Corporations Law, § 15; 16 NYCRR 275.8.) Plaintiff did neither.
In the case of Passantino v Consolidated Edison Co. (54 NY2d 840), the New York Court of Appeals held that although an initial cutoff of power due to alleged tampering may not require pretermination notice, the statutory five-day notice under section 15 of the Transportation Corporations Law is required once the customer, in this case commercial,»is billed for actual or estimated usage. Thus, states the court, Con Edison has a duty to restore service after an initially lawful cutoff, then give the consumer five days in which to pay the amount alleged to be owing, or face a second termination.
This holding of the State’s highest court clearly applies to the facts in the case at hand. In fact, not only did Brooklyn Union Gas fail to restore service or give notice to pay the amount due, it also failed to send any bill for the alleged unmetered gas usage.
Plaintiff maintains that it cannot be held answerable in damages to defendant unless defendant establishes gross negligence.
The limitations of liability in Brooklyn Union Gas’ tariff to gross negligence is not applicable to the intentional termination of the service of one customer. It applies rather to liability to the public as a whole for incidents such as blackouts, or negligently caused accidents. (Krasner v New York State Elec. & Gas Corp., 90 AD2d 921; see, *294 also, Passantino v Consolidated Edison Co., supra; Pompeii Estates v Consolidated Edison Co., 91 Misc 2d 233.)
In fact, the theory under which such limitations have been upheld is that they are a valid protection for the public against higher utility rates, a principle clearly applying only in the latter instance, not in the former.
Thus, the court holds that Brooklyn Union Gas is answerable to the defendant for its violation of duty to the extent that defendant has established the damages claimed in its counterclaim.
Plaintiff also contends that defendant may not recover any damages because it failed to make good faith efforts to mitigate damages.
A party who is damaged has a general duty to mitigate such damage, but is not required to take extraordinary measures (Carrols Equities Corp. v Villnave, 57 AD2d 1044), or go to “great expense, or to take such action as under the circumstances * * * would be imprudent.” (People's Gas & Elec. Co. v State of New York, 189 App Div 421, 424.)
A claimant is held only to a duty of good faith and reasonable effort. The burden of proof is upon the party alleging a failure to mitigate to establish “a willful or negligent failure” to do so. (Mullen v Jacobs, 58 Misc 2d 64, 71.)
In the case at bar, defendant was not obligated to convert to another type of fuel in order to mitigate damages. However, its failure to promptly make efforts to get the plaintiff to restore service was a failure to mitigate and defendant will not be awarded any damages which arose prior to any serious efforts on defendant’s part.
The court finds defendant’s compensable damages to be as follows:
(1) $19,000 for loss of its subtenant, Hastings Auto Restorations, Ltd.
Defendant established the existence of the sublease, the rental of $500 per month and the removal by the subtenant at the end of 1978 because there was no heat in the premises.
*295 (2) $33,725 for the loss of the contract with Blue Nile Company, Inc., and $45,000 for the loss of the Standard Motors contract, both causally connected to the unheated premises.
In regard to both of these agreements, the court has only allowed defendant compensation for the business that had already been committed to it and not for any other work it might have received, since any additional damages would be entirely speculative.
In calculating the damages, it was determined that defendant did not establish an anticipated profit margin of 40% as it alleged. The evidence concerning the cost and price projections and the considerations involved therein was inadequate. Therefore, since the only factual testimony regarding percentage of profit indicated that defendant’s profit margin in previous years had been 20% to 25%, the calculations herein were based on a profit of 20% of gross receipts.
The plaintiff has claimed that defendant cannot claim damages for contracts entered into which are not enforceable under the Statute of Frauds. (See Uniform Commercial Code, § 2-201.) However, in New York, a third party, i.e., one not a party to a contract, is not able to assert the defense of Statute of Frauds as this defense is said to be “personal” to the parties to the agreement. (Felicie, Inc. v Leibovitz, 67 AD2d 656.) In essence, this case holds that a contract which is not made in accord with the Statute of Frauds is not void, but only voidable subject to being declared void if and when the statute is properly interposed as a defense.
In the case herein, no party to an agreement raised the question, and, in fact, the evidence indicated that the parties had no intention of avoiding the agreement on that basis.
Defendant claimed certain damages to its building had been caused by the lack of heat in 1978. However, it failed to sustain its burden in establishing either the causal relationship or the reasonable value of repairs by any expert testimony whatever.
The court, in its discretion, does not award punitive damages to defendant.
*296 While plaintiff Brooklyn Union Gas was guilty of misconduct in failing to restore service to the defendant customer, in failing to give the required statutory notice and otherwise comply with the statutes and regulations, in failing to bill or advise as to the amount due as a prerequisite to restoration of service, and in failing to arrange and follow procedures for the restoration of service while a dispute as to the amount due is being resolved, its conduct, in the opinion of this court, does not rise to the level of malicious or wanton and reckless conduct or conduct resulting from a deliberate policy against the general public so as to justify an award for punitive damages. (La Belle v County of St. Lawrence, 85 AD2d 759; Granato v Allstate Ins. Co., 70 AD2d 948.)
The Court of Appeals in Passantino (54 NY2d 840, supra) held that the jury in that case had sufficient evidence to justify its finding that Con Edison knowingly and deliberately deprived plaintiff in that action of their right to service and/or restoration of service.
In the instant case, while there is some evidence that plaintiff’s employee Robert Reif was deliberately and maliciously delaying restoration of service in January, 1979, the evidence is not sufficient to support the allowance of punitive damages against the Brooklyn Union Gas Company.
Plaintiff requests that the court take judicial notice of a certificate of occupancy, which was not offered into evidence during the trial, but a certified copy of which is submitted with its memorandum of law. It alleges that if defendant were to perform the contracts it lost by reason of having no heat, it would be in violation of the certificate of occupancy and therefore illegal, and that this fact should prevent defendant’s being awarded damages for loss of profits on those contracts.
The court refuses to take judicial notice of the certificate of occupancy. It was not introduced during the trial and defendant had no opportunity for voir dire or to rebut it or to introduce evidence as to its interpretation. In fact, on its face, there is no way to know whether it is the only or latest certificate of occupancy or whether it was ever amended.
*297 In any event, the certificate of occupancy would not be an effective defense for plaintiff on defendant’s counterclaim.
Using real property in a manner not authorized by the certificate of occupancy creates building violations and gives a remedy to the local government to impose fines or otherwise enforce its laws.
A collaterally connected illegal act, entirely incidental to a contract does not prevent the contract from being valid. Such a contract will be enforced where the illegality is merely incidental. (Contemporary Mission v Bonded Mailings, 671 F2d 81.)
In the instant case, the relationship between the issues herein and the illegality is even more remote, since it is not being raised in defense to enforcement of the contract, but rather is being raised by a third party in defense to a claim of damages sustained by loss of the contract through the third party’s fault.
There is certainly no public policy reason to hold otherwise, since the possible illegality involves no moral turpitude.
In accordance with the above decision, this court awards judgment to the defendant in the amount of $99,725.