OPINION OF THE COURT
James P. King, J.
Motion by defendant for an order dismissing the second cause of action.[1]
After the close of evidence in trial of this action, defendant moved to dismiss the claim’s second cause of action brought by claimant Barry, Bette & Led Duke (BBL) on behalf of its subcontractor C.T. Brickman & Associates, Inc. (Brickman). BBL was the prime general construction contractor on an Office of General Services (OGS) project to build a headquarters complex for the New York State Division of Military and Naval Affairs, and Brickman was BBL’s subcontractor for work on the project’s acoustical ceilings. The subcontractor’s claim is for $38,315.97 as compensation for amounts allegedly lost *596 because of delay, extra work and extra costs caused by the "active interference, unreasonable decisions and directions, gross negligence, misrepresentations and breach of contract” by OGS. Brickman has not alleged that BBL in any way caused the subcontractor’s loss.
This motion is limited to the single issue of whether defendant can be liable for any such loss when, according to its counsel, BBL is not liable to Brickman for injury caused by OGS, has not agreed to pay over to Brickman any sums recovered on this cause of action, and was not itself injured by the events giving rise to this cause of action. For the purposes of this motion, it will be assumed that Brickman can succeed in proving its loss and in proving that the loss was caused by wrongful conduct on the part of the State.
Where, as here, there is no contract between an owner and a subcontractor and where the prime contractor was not damaged by the owner’s actions alleged to have harmed the subcontractor, the prime contractor may not sue the owner for compensation for those damages unless it has some specific legal obligation to do so (Degnon Contr. Co. v City of New York, 235 NY 481).[2] Because no assumption of liability is implied by law in this situation (Triangle Sheet Metal Works v Merritt & Co., 79 NY2d 801, 802), the prime contractor is not responsible for delay or other losses of the subcontractor that were caused by the owner or some other entity (e.g., another prime contractor). The subcontractor may not sue the owner directly because there is no privity of contract between those two parties.
The interest of the subcontractor in these situations can be protected — and most often is protected — by an agreement between the prime contractor and subcontractor which, in some fashion, provides that "all recovery will, in effect, pass through the general contractor to the injured party, thereby leaving the subcontractor and the owner to pursue their claims” (Lambert Houses Redev. Co. v HRH Equity Corp., 117 AD2d 227, 230). Where there is such liquidating agreement, the subcontractor need only prove that the owner’s actions caused injury in order to recover from the prime contractor, and once the prime contractor has compensated the subcontractor for those damages, it has then suffered actual damage and is in a position to sue the owner for indemnification.
*597 The effect of the typical liquidating agreement, therefore, is to simply shorten the steps required, by permitting a "pass through” cause of action in which the subcontractor is not required to first bring suit against the prime contractor (Schiavone Constr. Co. v Triborough Bridge & Tunnel Auth., 209 AD2d 598, 600) and the prime contractor is not required to actually pay out damages prior to suing the owner (Hubbell Elec, v State of New York, 153 Misc 2d 810, 812; Mars Assocs. v New York City Educ. Constr. Fund, 126 AD2d 178, 192). The end result is that the subcontractor is compensated for losses caused by the owner and the owner ultimately pays for such damage. The dispute in this case is whether there was an agreement of the type described above between BBL and Brickman and whether, if there was no such agreement, the State may assert that fact as a "shield” to protect it from liability for its own acts.
There is no fixed form required for the agreement between the prime contractor and the subcontractor. It may be memorialized in the subcontract or in a separate written agreement, or it may be verbal (Hubbell Elec, v State of New York, 153 Misc 2d 810, 812, supra; Elderlee, Inc. v State of New York, Ct Cl, Hanafin, J., claim No. 66176). In Nolfi Masonry Corp. v Lasker-Goldman Corp. (160 AD2d 186), the Appellate Division held that the necessary agreement could be "assembled” from several documents executed over a span of 10 years: a 1973 letter in which the prime contractor "agreed to present [the subcontractor’s] claim to the State and to pay over 'the full amount of any net recovery * * * relating to such claims’ ”; a 1975 liquidating agreement in which the subcontractor released the prime contractor from liability for delay claims; and a 1983 letter referring to the subcontractor’s " 'proportionate share’ ” of any recovery. When considered together, these documents were found "sufficient to make out an agreement” (supra, at 187).
The agreement may be reached at almost any time. It can be incorporated into the initial subcontract (Schiavone Constr. Co. v Triborough Bridge & Tunnel Auth., 209 AD2d 598, 600, supra); reached by the parties while the work is underway (Ardsley Constr. Co. v Port of N. Y. Auth., 61 AD2d 953, 954) or soon after completion of construction (Nolfi Masonry Corp. v Lasker-Goldman Corp., 160 AD2d 186, supra); or even be entered into years after litigation has commenced and discovery begun (Lambert Houses Redev. Co. v HRH Equity Corp., 117 AD2d 227, supra; Tully & Di Napoli v State of New *598 York, 51 Misc 2d. II).[3] With respect to content, liquidating agreements or contract provisions designed to lay the groundwork for a "pass through” action should establish, at a minimum, an agreement between the prime contractor and subcontractor regarding prosecution of the claim against the owner for the subcontractor’s losses and an obligation to pay over to the subcontractor any compensation received for such damages (Schiavone Constr. Co. v Triborough Bridge & Tunnel Auth., 209 AD2d 598, 600, supra). This can be done expressly, as in Tully & Di Napoli v State of New York (51 Misc 2d 11, 13, supra), where there are several references to the " 'liability and obligation’ ” to the subcontractor that are " 'acknowledged’ ” by the contractor or the admission of liability can be inferred from, for example, contract provisions relating to the commencement of an action against the owner, either by the prime contractor or in its name (see, e.g., Matter of Primiano Constr. Co. v Ferran Concrete Co., 117 Misc 2d 523). More complete agreements will contain language detailing which party is to bear the cost of or assume control of the litigation and the apportionment of payment to be made to the subcontractor in the event of an award (supra; Gibson & Cushman Dredging Corp. v Halliburton Co., 111 AD2d 741), but a simple agreement that the prime contractor will pay over to the subcontractor any sums recovered from the owner (relating to the subcontractor’s losses, of course) is sufficient (Hubbell Elec, v State of New York, 153 Misc 2d 810, supra).
The rigid formality of some earlier decisions is being lessened. In 1923, in Degnon Contr. Co. v City of New York (235 NY 481, supra), the absence of a liquidating agreement between the parties allowed the defendant to avoid paying for increased costs that were, without dispute, caused by the negligence of its employee. For a period, in the 1930’s, individual enabling acts were passed by the Legislature to avoid such inequitable results, but eventually this was found to be unnecessary, at least in those instances where the actions of the owner caused extra expense to be incurred by the prime *599 contractor and, in turn, by the subcontractors (J. Harry McNally, Inc. v State of New York, 170 Misc 914, 916).
It is now accepted that, at least where the existence of an agreement is not in dispute, that questions about the language and form of a liquidating agreement — in other words, its legal effectiveness — may not be used by an owner to avoid liability. In Ardsley Constr. Co. v Port of N. Y. Auth. (61 AD2d 953, supra), where the liquidating agreement allowed the subcontractor to sue the owner in the prime contractor’s name but otherwise absolved the prime contractor of any liability for the extra work and materials occasioned by the owner’s conduct, the owner argued that because the liquidating agreement "relieved” the prime contractor of any liability or responsibility for the losses suffered by the subcontractor, the prime contractor had not been and could not be damaged, thus precluding suit against the owner. The Appellate Division held, however, that the agreement between the prime contractor and its subcontractor affected only their relationship and could not be used as a "shield” by the owner (supra, at 954). This approach has been followed in Lambert Houses Redevelopment Co. v HRH Constr. Corp. (117 AD2d 227, supra), where the owner argued that the liquidating agreement was defective because it was an attempt to circumvent General Obligations Law § 15-108 (a), and in Hubbell Elec, v State of New York (153 Misc 2d 810, supra), where the owner argued that the liquidating agreement was ineffective because it was verbal. On the other hand, the Court of Appeals has cautioned against concluding that a prime contractor "has implicitly agreed to assume responsibility for all delays that a subcontractor might experience — no matter what their cause” (Triangle Sheet Metal Works v Merritt & Co., 79 NY2d 801, 802, supra). This statement was made in the context of an action between the prime contractor and the subcontractor, where the parties disagreed about whether there had been an agreement. It is not clear that the same caution would apply where an owner was attempting to shield itself from liability by arguing against the existence of an agreement that was being acknowledged, and honored, by both principals to the agreement.
In asserting that there is no liquidating agreement between BBL and Brickman, defendant relies on (1) the unrebutted testimony of Brickman’s principal that his company had no contract with the State for work performed on the project; (2) the unrebutted testimony of Brickman’s principal that there was no written contract between his company and BBL obligat *600 ing BBL to pay over to Brickman any amount it might receive from the State as damages on the second cause of action (i.e., as damages for Brickman’s loss caused by the State); and (3) the absence of any testimony that there was an oral agreement to that effect between BBL and Brickman. The court agrees with, and counsel for Brickman does not dispute, these characterizations of the testimony.[4] Brickman’s counsel contends, however, that the subcontract itself contains language that is sufficient to establish the agreement and/or that the actions of the parties provide reliable evidence of such an agreement.
Counsel’s arguments based on paragraphs 3 and 5 of the subcontract are unavailing. The former provision sets the price BBL agrees to pay for Brickman’s work and provides for payment to Brickman within 10 days after receipt of corresponding payments from the owner. This cannot fairly be read as obligating BBL to pay over to Brickman any portion of an award for delay damages caused by another party. In fact, a very similar provision was involved in Degnon Contr. Co. v City of New York (235 NY 481, 484, supra), and determined to have no effect on the issue at hand. Paragraph 5 binds the prime contractor, in its interactions with the subcontractor, "by all the obligations that the Owner assumes to the Contractor under the contract between them.” Under the main contract, the State is obligated to compensate Brickman for delay, extra work, and other loss resulting from its (i.e., the State’s) actions. The corresponding duty imposed on BBL by paragraph 5 is BBL’s obligation to compensate Brickman for delay, extra work, and other loss resulting from its (i.e., BBL’s) actions, not the actions of a third party.
Paragraph 7 of the subcontract reads as follows: "The said Contractor agrees in the event of any arbitration involving the work and materials mentioned in this contract under the terms and provisions of said contract between the Contractor and the Owner, to give the Sub-Contractor an opportunity to be present and submit evidence in reference thereto and to name as arbitrator the person named by the said Sub-Contractor, if. the *601 sole cause of the controversy is the work and materials, rights or responsibilities of the Sub-Contractor; or, if the SubContractor and any other Sub-Contractor jointly, to name such arbitrator the person upon whom they agree.” While the parties before us are not engaged in an arbitration proceeding, this provision recognizes that Brickman has an interest in any dispute between BBL and the State, where the subject of that dispute relates to Brickman and its work on the project. This, of course, suggests that the subcontractor stands to benefit from the arbitrator’s award. This provision alone, however, is not sufficient to impose liability on the prime contractor in all circumstances. The most that can be said is that the subcontract contains no language absolving the prime contractor of such liability and at least one provision acknowledging that the subcontractor has an interest in disputes with the owner relating to its work, materials, rights or responsibilities.
Despite the silence of the subcontract, the lack of any other written document or documents memorializing an agreement, and even the testimony that there was no written agreement, the court finds that there was a valid liquidating agreement between Brickman and BBL. It is well accepted that a legally enforceable agreement can be created by the parties’ "course of conduct and communications”, where the intent of the parties is evidenced by their words and deeds (Brown Bros. Elec. Contrs. v Beam Constr. Corp., 41 NY2d 397, 399-400). Factors to be considered in determining whether a valid agreement exists include the parties’ writings, their prior negotiations, their respective situations, and the goals they were attempting to achieve (supra; Weiner v McGraw-Hill, Inc., 57 NY2d 458). There must be evidence of a meeting of the minds of the parties concerned (Kreisler Borg Florman Gen. Constr. Co. v Rosen & Morelli Masons, 181 AD2d 813, 814).[5]
*602 To determine whether a contract exists, the trier of fact must consider "whether the parties meant to be bound” (Lehrer McGovern Bovis v New York Yankees, 207 AD2d 256, 259), and testimony of the principals at the time of trial is not always the best evidence of their intentions. In Lehrer McGovern Bovis (supra), the New York Yankees, through their owner George Steinbrenner and other officials, directed a construction management firm to perform preconstruction services in connection with renovations to Yankee Stadium, accepted performance of those services, met with the firm on numerous occasions, and raised no objection to invoices sent by the firm. This, the appellate court ruled, was quite sufficient to raise a question of fact as to whether a contract had been formed despite the testimony of a former partner in the firm that no agreement existed (supra, at 259).
The course of conduct between Brickman and BBL leaves room for no conclusion other than that both parties intended for BBL to prosecute Brickman’s claim against OGS and to pay over to Brickman any award received in satisfaction of such claim. Claimant’s verified amended claim[6] was filed in May 1988 and contained a second cause of action, totalling $38,315.97, "which sum claimant claims on behalf of said subcontractor [Brickman]”. From the beginning, both parties included the Brickman claim in discovery responses and demands, and Brickman has had retained counsel representing its interests in this action at all times.
Significantly, Brickman has never attempted to directly sue either the State or BBL to recover its losses. It does not matter that either or both of those suits might be unsuccessful, if BBL could prove that any loss was caused by OGS and OGS were to rely on the lack of privity between it and Brickman. As pointed out in Nolfi Masonry Corp. v Lasker-Goldman Corp. (160 AD2d 186, 187, supra), "good faith relinquishment of a cause of action, even one which proves to be unenforceable, constitutes valid consideration.”[7] It is this consideration — the subcontractor’s refraining from bringing an action against the prime contractor — that is typical and almost uniformly present in all *603 liquidation agreements of this type. Since Brickman clearly feels entitled to compensation for its losses and has been willing to retain counsel and be consistently active in litigation for over eight years, its failure to sue the only party with whom it is in privity is inexplicable unless it is acting in reliance on an understanding with BBL that its claim is going to be prosecuted by that party. Brickman has, in fact, lost its opportunity to sue either BBL or the State, because of the Statute of Limitations and thus can be said to have fully performed its part of the agreement. Likewise, there is no reason for BBL to consistently assert its subcontractor’s cause of action unless it, too, is carrying out the term of an agreement with that party, an agreement from which it benefitted by not being made the defendant in a lawsuit.
While this ruling goes somewhat further than previous decisions on this question, we believe that it is consistent with the spirit of recent case law development, current public policy regarding the rights of subcontractors, and basic fairness and common sense. The relevant case law trends and evolutions have been discussed above. With respect to public policy, the Court of Appeals very recently stressed the Legislature’s position regarding protecting subcontractors who have expended labor and materials to improve real property. In West-Fair Elec. Contrs. v Aetna Cas. & Sur. Co. (87 NY2d 148), the Court invalidated, as contrary to public policy, "pay-when-paid” provisions that forced the subcontractor to assume the risk of nonpayment by the owner.
At a practical level, there is simply no reason to impose rigid, formalistic requirements to permit a "pass through” action of this sort. The relationships between the owner of a public construction project, the prime contractor(s), and the subcontractors are well established and regularized. All parties are known to one another, and the likely effect of each party’s actions can be reasonably assessed, whether or not there is formal privity of contract. The mechanism of a "pass through” claim and the agreements underlying such an action have become an accepted and typical part of a construction project, so accepted and so typical that a subcontractor may not realize the need for written proof of the agreement. When both parties to a contract acknowledge that there was an agreement of this sort and consistently carry out its terms, and where no other person or party is harmed or surprised by the *604 existence of the agreement, a third-party should not be able to avoid liability because the cooperating entities omitted a formality.
The only thing that could be achieved by granting defendant’s motion in this situation would be to penalize Brickman for the oversight of their legal advisors; no other significant right or interest would be being protected. Neither of those parties have raised questions about the existence of an agreement; the terms of the agreement are rather self-evident and known to all concerned, including the State; and there is no reason to doubt that the injured party, the subcontractor, will fail to receive any sum recovered from the owner.[8] In short, there is nothing to protect against by adhering to formalistic requirements.
For the reasons set forth above, defendant’s motion to dismiss the second cause of action is denied.

. Defendant’s motion was made at the close of claimant’s case in the trial of this action, and the court requested that counsel submit briefs. A motion number was subsequently assigned.

. There are exceptions to this rule, as when the prime contractor is actually an agent of the owner (Kelly Masonry Corp. v Presbyterian Hosp., 160 AD2d 192), but none that are relevant in this situation.

. It is evident that, in the instant claim, defense counsel waited until after the close of evidence to make this motion in the belief that an agreement executed after that point would be invalid. We note, however, that in Hubbell Elec, v State of New York (153 Misc 2d 810, supra), the prime contractor and subcontractor submitted written liquidating agreements that were executed after, and in response to, the tiling of defendant’s motion to dismiss. Because the court held that there was a preexisting verbal agreement, and because the submissions were technically late, there was no ruling as to their effectiveness, but the possibility that they were valid was not rejected.

. Other than counsel’s arguments, the only statements at trial about an agreement between Brickman and BBL were the following: Defense counsel asked, "[DJoes your company, C.T. Brickman and Associates, at this time have an agreement with Barry, Bette & Led Duke as to what’s to happen with the money, if any, that this court may award to [BBL] on this claim, the second cause of action, for removing and replacing fireproofing? * * * Do you have any signed agreement?” To this, Conrad T. Brickman, the subcontractor’s president, replied, "No, sir. Not to my knowledge.” (Transcript, at 3106.)

. Like oral contracts, contracts created by a course of conduct are subject to the Statute of Frauds and void unless capable of performance within one year (supra). However, third parties to the contract may not raise the Statute of Frauds as a defense, for it is personal to the parties to the agreement (Stitt v Ward, 142 App Div 626; Brooklyn Union Gas Co. v MacGregor’s Custom Coach, 122 Misc 2d 287, mod on other grounds 133 Misc 2d 582), and the existence of the agreement must be denied by one of the contracting parties before the Statute of Frauds can be invoked (Givens, Practice Commentaries, McKinney’s Cons Laws of NY, Book 23A, General Obligations Law § 5-701,1996 Pocket Part, at 41). Consequently, an owner may not invoke the Statute of Frauds to invalidate a liquidation agreement that is acknowledged and honored by both the prime contractor and the subcontractor (Hubbell Elec, v State of New York, 153 Misc 2d 810, supra).

. The original claim was filed in December 1986, within six months after OGS advised claimant that all administrative remedies under the contract had been exhausted. This claim was technically premature, as there had been no final payment by the State. The amended claim was filed over a year later, shortly after OGS mailed the final payment.

. It is also not certain that Brickman would have been unsuccessful. At trial, defense counsel argued that the loss suffered by Brickman was, in fact, caused by BBL’s failure to coordinate and was "a matter which Bette, Barry *603 & Led Duke should have adjusted — with Brickman” rather than looking to the State for compensation (transcript, at 3023).

. Despite defense counsel’s expressions of concern, it is highly unlikely that BBL will withhold the award from Brickman if there is recovery on the second cause of action. In South Mall Constructors v State of New York (94 AD2d 867, 869), the Third Department held that a prime contractor who recovered a certain sum based on its "claimed liability” to a subcontractor would not be permitted to "obtain a windfall” by later relying on certain provisions of the subcontract to challenge that same liability. We are confident that this would be the result in any instance where a prime contractor recovers from the owner on behalf of a subcontractor and then attempts to avoid paying over the sum recovered.