OPINION OF THE COURT
Ellen Gesmer, J.
In this commercial holdover proceeding, petitioner seeks possession of the store which respondents have occupied for the last 15 years. Petitioner claims that respondents have no lease and that petitioner has validly terminated respondents’ month-to-month tenancy. Respondents’ defense is that they have a valid lease, which was signed by Armand Chiofalo, the managing agent of petitioner’s predecessor. In reply, petitioner argues that the lease respondents rely on is void under the statute of frauds for two reasons: first, the rider to the lease, which sets out the payment terms, was not executed by Mr. Chiofalo, and second, Mr. Chiofalo did not have written authorization to sign leases for petitioner’s predecessor.
The purpose of the statute of frauds is to avoid fraud by barring the enforcement of contracts which were never made. In this case, the petitioner is seeking to do just the opposite: to use the statute to avoid a contract which was ratified and accepted by the parties to it. If the court were to accept this argument, it would be doing an injustice to the respondents by permitting the petitioner to repudiate a valid contract. The court refuses to do so, and holds that respondents have a valid lease which is in effect until April 30, 2009. Accordingly, for the reasons set forth more fully below, the court dismisses the petition.
Findings of Fact
The court makes the following findings of fact, based on the testimony and the exhibits introduced at trial.
From about 1960 to 2003, the building at 30 Carmine Street., New York, New York (the building), was owned by Cin-Cin Realty Corp. Most recently, the principal of Cin-Cin was Yvonne Wagner, who inherited the corporation from her father. Ms. Wagner’s father, and then Ms. Wagner, retained Armand Chiofalo, who did business under the name Greenwich Village *838 Brokers, to act as managing agent for the building. Mr. Chiofalo negotiated leases, signed leases, collected rent and paid the bills for the building on behalf of Cin-Cin. Ms. Wagner did not have a written agreement with Mr. Chiofalo concerning his management of the building and she did not know whether her father did.
In or about 1989, Stephen Depierro and Alex Del Valle (tenants or respondents) leased the west store (the store) at the building. They opened a hair salon which they have operated continuously at the store since then under the name “Hairhoppers.” Over the years, they had several written leases with Cin-Cin, each of which was signed by Mr. Chiofalo on behalf of Cin-Cin. In or about the end of 2000, Mr. Depierro and Mr. Del Valle began to negotiate a new lease with Mr. Chiofalo for the period from May 1, 2002 through April 30, 2009. After the parties negotiated the terms, Mr. Chiofalo drafted the lease, comprising a form lease and a rider setting out the rental terms, and sent it to Mr. Depierro and Mr. Del Valle. They signed both the form portion of the lease and the rider and returned them to Mr. Chiofalo, who in turn returned it to them. However, when the respondents examined the lease that Mr. Chiofalo sent back to them, they observed that he had executed the form lease but not the rider. Mr. Del Valle then took the partially executed lease to Mr. Chiofalo’s office and told Mr. Chiofalo’s secretary, Andrea, that he had brought back the lease so that Mr. Chiofalo could sign the rider, which he had neglected to sign. Andrea took the lease from Mr. Del Valle and then returned it to him with the rider signed by Mr. Chiofalo on the line above the name “Cin-Cin Realty Corp.” Mr. Del Valle returned to the store and later told Mr. Depierro that Mr. Chiofalo had signed the rider. Consistent with the rent schedule set out in the rider to the lease, respondents began paying $1,900 per month in May 2002, and Mr. Chiofalo accepted these rent payments on behalf of Cin-Cin.
In or about early 2002, Ms. Wagner decided to sell the building. Dean Ross became interested in purchasing it sometime between January and March 2002, and began negotiating with Ms. Wagner. At that time, Ms. Wagner was not aware that Mr. Chiofalo had signed a lease with respondents for the period beginning May 2002. When she first learned of the lease, during the summer or fall of 2002, she did not disavow it. Instead, she told Mr. Ross that Mr. Chiofalo had signed a lease with respondents and that she had to honor it. She also told him that *839 she was upset because she believed that Mr. Chiofalo could have charged a higher rent.
On or about October 9, 2002, as part of her preparation to sell the building, Ms. Wagner drew up a “set up sheet,” setting out the rents in the building. (Respondents’ exhibit B.) With respect to “Store No. 2 West,” she indicated on the set up sheet that there was a lease in effect through July 31, 2010. She also indicated that the rent for “Store No. 2 West” was $1,900, with an asterisk stating “See Attached Riders.” Ms. Wagner faxed the set up sheet to Mr. Ross, together with the rider to the lease. The copy of the rider that she faxed to Mr. Ross did not bear Mr. Chiofalo’s signature. In the months that followed, Mr. Ross did not take any steps to verify the rents listed in the set up sheet, such as checking the records at the Division of Housing and Community Renewal, asking to see the underlying leases or speaking to respondents or any of the other tenants in the building.
On January 7, 2003, Ms. Wagner, as the principal of Cin-Cin, and Mr. Ross, as the principal of 30 Carmine LLC (petitioner), signed a contract of sale (the contract) for the building and had a simultaneous closing. Schedule E to the contract was a rent roll, which set out that “St-2” was occupied by Stephen Depierro and Alex Del Valle, that their rent was $1,900 per month, subject to escalations, and that they had a security deposit of $3,000 and rental arrears of $4,200. Under the columns “Lease Start” and “Lease End,” the rent roll stated “May 1, 2002” and “April 30, 2003,” respectively. The rent roll was accompanied by a certification from Ms. Wagner that the rent roll was true and correct and that the rents were in the amounts actually being collected. At the closing, Ms. Wagner gave Mr. Ross copies of the leases for all of the occupied portions of the building, including respondents’ lease, comprising the form portion and the rider.
Shortly after the closing, Mr. Ross spoke with Mr. Del Valle, and arranged to meet with him and Mr. Depierro. Mr. Ross requested the meeting because he wanted to collect the tenants’ rent arrears. Accordingly, in mid to late January, Mr. Ross met with Mr. Depierro and Mr. Del Valle, together with Mr. Gersino, an employee of JVG Management which Mr. Ross had retained to manage the building. At that meeting, Mr. Ross showed the tenants his copy of their lease and asked if it was their lease. The copy that he showed them did not have Mr. Chiofalo’s signature. The tenants identified the document that he showed *840 them as their lease. Mr. Ross then told them that he had bought the lease and that they owed back rent.
Mr. Ross had several subsequent conversations with Mr. Depierro, including one on February 26, 2003 which he taped. At some point between the January meeting and February 26, 2003, Mr. Depierro decided to try to use to his advantage the fact that the copy of the rider in Mr. Ross’ possession was unsigned. Mr. Depierro believed that the tenants of the other store in the building paid a lower rent. Consequently, he told Mr. Ross falsely in their conversation on February 26 that Mr. Chiofalo had given him two lease riders, one identical to the one in Mr. Ross’ possession, and then a second one, with lower rents, commensurate with the rents paid by the other store. He further falsely told Mr. Ross that Mr. Chiofalo had not signed either of the riders, even though he in fact had the rider signed by Mr. Chiofalo in his possession. Mr. Depierro told this false story to Mr. Ross in the belief, which turned out to be mistaken, that he could use the story to negotiate a lower rent.
Although Mr. Ross and Mr. Depierro had many subsequent discussions, they did not execute any other lease. Respondents continued to pay rent of $1,900 per month, consistent with the schedule set forth in the rider to the lease, and JVC, on behalf of 30 Carmine LLC, accepted it. In May 2003, JVC, after consultation with Mr. Ross, began to charge the tenants $2,200 per month, which the rider set forth as the rent scheduled to go into effect as of that date. The tenants paid, and JVC accepted, rent of $2,200 per month from May 2003 through April 2004. Similarly, in May 2004, JVC started billing the tenants at the rate of $2,500 per month, the amount set forth in the rider to the lease, and they paid rent at that rate, which JVC accepted. Analysis
Since both of petitioner’s objections to the lease turn on the statute of frauds, the court must address a preliminary matter raised by the respondents. Respondents contend that petitioner, as the transferee of the property from Cin-Cin, may not raise the statute of frauds since it was not a party to either the original lease or to an agreement between Cin-Cin and Mr. Chiofalo. The court rejects this argument. The prevailing law is that a party may raise the statute of frauds as a defense to a contract executed by its predecessor in interest. For example, in Commission on Ecumenical Mission & Relations of United Presbyt. Church v Roger Gray, Ltd. (27 NY2d 457, 465 [1971]), the Court of Appeals decided a challenge to a lease based on the *841 statute of frauds raised by a party which had purchased the property from one of the parties to the lease in dispute, thus implicitly holding that a transferee may raise the statute of frauds as a defense to a lease signed by its predecessor in interest. Indeed, in one of the cases cited by respondents, the court took the same position and entertained a defense based on the statute of frauds to a contract signed by the predecessor of the party raising the defense.[1] (Brockport Devs. v 47 Ely Corp., 82 Misc 2d 310, 315 [Sup Ct, Monroe County 1975]; see also, Holm v C.M.P. Sheet Metal, 89 AD2d 229 [4th Dept 1982]; Club Chain of Manhattan v Christopher & Seventh Gourmet, 74 AD2d 277, 282 [1st Dept 1980].) Accordingly, the court holds that petitioner may raise the statute of frauds as a defense to the lease.
Petitioner’s first objection to the lease is that the rider was not signed by anyone on behalf of Cin-Cin, and, consequently, the lease is not enforceable. As set forth above, the court finds that the rider to the lease was in fact signed by Mr. Chiofalo. The court bases that conclusion on its analysis of the testimony and its credibility findings. First, the court finds that Mr. Del Valle was totally credible when he testified that he observed, upon receiving the lease, that Mr. Chiofalo had not signed the rider, that he promptly went to Mr. Chiofalo’s office to have it signed, and that he left Mr. Chiofalo’s office with a fully executed lease, including the rider signed by Mr. Chiofalo. In addition, the court notes that on the copy of the lease in respondents’ possession (respondents’ exhibit A), Mr. Chiofalo’s signature appears to be original, and the signatures of the respondents appear to be copies. That is entirely consistent with Mr. Del Valle’s testimony.
Second, Ms. Wagner, who had worked with Mr. Chiofalo for many years, identified the signature on the rider as that of Mr. Chiofalo. Moreover, her testimony supports the conclusion that a valid lease had been executed prior to the summer of 2002. *842 Specifically, Ms. Wagner was entirely credible when she testified that she first learned in the summer of 2002 that Mr. Chiofalo had executed a new valid lease with respondents, that she promptly told Mr. Ross about the lease and that she was upset because she felt that Mr. Chiofalo had not rented the store for top dollar. Petitioner contends that Ms. Wagner’s statement that she knew in the summer of 2002 that the rider had been signed is inconsistent with the affirmative representations that she made in petitioner’s exhibits 3 and 9. I reject this argument. Petitioner’s exhibit 3 was not admitted into evidence and thus cannot be considered. Petitioner’s exhibit 9, the rent roll attached to the contract of sale, stated, with respect to the store, that the rent was $1,900; that the lease start and end dates were May 1, 2002 and April 30, 2003, respectively; that respondents had a security deposit of $3,000; that they were in arrears in rent in the amount of $4,200; and that their rent was subject to “escalations.” Since the rental amount listed for the store in petitioner’s exhibit 9 was identical to the amount set forth in the rider, Ms. Wagner’s certification of the rental amount is entirely consistent with her belief that the rider had been executed. Moreover, the lease “start” date was consistent with the lease and the rider, and the “end” date corresponds to the last date when the rental amount stated in the rent roll was in effect. Finally, I reject petitioner’s argument that Ms. Wagner’s verification of the “end date” of the lease as April 30, 2003 proves that she believed that the lease was not in effect. I note that, at the closing, Ms. Wagner gave respondents’ lease, as well as the leases of all of the other tenants, to Mr. Ross. Therefore, I find that the purpose of the rent roll was not to put Mr. Ross on notice of the provisions of the tenants’ leases, since he could learn that from the leases themselves. Rather, I find that the purpose of the rent roll was to secure for the purchaser Ms. Wagner’s representation that the rents listed were actually being collected. Accordingly, I do not find that the discrepancy between the “end” date of the lease stated in the rent roll and the actual date of termination of the lease constitute an affirmative representation by Ms. Wagner, as petitioner contends, that the lease was not in effect.
Third, I reject petitioner’s argument that Mr. Depierro’s statements to Mr. Ross at their various meetings, including those captured on tape, establish that Mr. Depierro knew that the rider was unsigned. Mr. Depierro testified credibly that he knowingly made false statements to Mr. Ross when he told him that *843 the rider was unsigned, that Mr. Chiofalo had refused to sign it, and that Mr. Chiofalo had tendered to him a rider with a lower rent schedule. He explained credibly that he felt no obligation to speak truthfully to Mr. Ross, as he felt that Mr. Ross was harassing him. He also was credible when he testified that he believed that he might be in a better position to negotiate a lower rent with Mr. Ross if he convinced Mr. Ross that the rider to his lease had not been signed. While Mr. Depierro’s belief may have been naive and even misguided, the court nonetheless finds that he held that belief in good faith, that he acted on that belief and that he was utterly credible in testifying to it.
Fourth, Mr. Ross’ claim that he believed that the rider had not been executed is inconsistent with both his claim that the lease ended in 2003 and with his own actions. If, as Mr. Ross claims, the rider had not been signed by Mr. Chiofalo at all, then the lease would be void and unenforceable because the preprinted portion of the lease did not state any rental terms and thus, by itself, did not state all of the essential terms of the agreement. (Joseph Martin, Jr., Delicatessen v Schumacher, 52 NY2d 105, 109-110 [1981].) Consequently, his stated belief that the lease ended in 2003 is inconsistent with his claim that the rider was not signed. Moreover, JVC, acting as Mr. Ross’ agent, increased respondents’ rent in May 2003 and again in May 2004 to the amounts set forth in the rider. Mr. Ross’ testimony that he authorized the rent to be increased to those amounts because it seemed “fair” was not credible. Rather, the court finds that Mr. Ross directed his managing agent to increase respondents’ rent in May 2003 and again in May 2004 to the amounts set out in the rider because the lease was in effect. Accordingly, the court finds that respondents met their burden of showing that the rider to the lease was executed by Mr. Chiofalo.[2]
This brings us to the question of whether, as petitioner contends, the lease is nonetheless unenforceable, under the statute of frauds, since Mr. Chiofalo concededly lacked written authorization from Cin-Cin to sign leases on its behalf. (See Commission on Ecumenical Mission & Relations of United Presbyt. Church v Roger Gray, Ltd., 27 NY2d 457, 465 [1971]; Lip *844 ton v Kiamie Princess Marion Realty Corp., 2 AD3d 318 [1st Dept 2003]; see also 2A NY Jur 2d, Agency and Independent Contractors § 24.) New York’s General Obligations Law § 5-703 (2) provides that a contract for the leasing for a longer period than one year of any real property is void “unless the contract or some note or memorandum thereof, expressing the consideration, is in writing, subscribed by the party to be charged, or by his lawful agent thereunto authorized hy writing” (emphasis added). Consequently, the lease signed by Mr. Chiofalo on behalf of Cin-Cin appears to violate the statute of frauds.
However, a court may enforce a contract that runs afoul of the statute of frauds where the refusal to enforce the agreement will result in injustice (Club Chain of Manhattan v Christopher & Seventh Gourmet, 74 AD2d 277, 281-282 [1st Dept 1980]) or a fraud upon one of the parties to the contract (Veeder v Horstmann, 85 App Div 154, 160 [3d Dept 1903]). Since the purpose of the statute of frauds is to avoid the “peril of perjury and error . . . latent in the spoken promise” (Burns v McCormick, 233 NY 230, 234 [1922]), courts may enforce oral agreements, notwithstanding the statute, where there is a negligible risk of perjury or error. (See, e.g., Crabtree v Elizabeth Arden Sales Corp., 305 NY 48, 56 [1953].)
In this case the court will enforce respondents’ lease, notwithstanding the statute of frauds, for three reasons. First, the court can piece together adequate written documents to establish Mr. Chiofalo’s agency relationship with Cin-Cin. Second, Cin-Cin ratified the lease, thereby rendering it valid and binding on petitioner when it purchased the building. Third, petitioner accepted respondents’ attornment to the lease and is therefore bound by it.
First, the writing necessary to satisfy the statute of frauds need not be in a specific form. As the Court of Appeals explained:
“The purpose of Statutes of Frauds is to avoid fraud by preventing the enforcement of contracts that were never in fact made. Generally the statute is satisfied by some note or memorandum signed by the party to be charged that is adequate to establish an agreement when considered in light of the admitted facts and surrounding circumstances. Given proof of agreement by such evidence, its particular terms may be furnished by piecing together other, related writings (Crabtree v Elizabeth Arden Sales *845 Corp., 305 NY 48, supra). The writings are not the agreement, of course, only evidence of the agreement. They are required so that there is no serious possibility that the assertion of the contract is false.” (Henry L. Fox Co. v Kaufman Org., 74 NY2d 136, 140 [1989].)
The extent of the writing required depends on the circumstances. As the Court of Appeals explained, “New York has enacted several Statutes of Frauds, each with its own particular language and requirements . . . Thus, the statutes may require more or less particularity in the writings depending upon the Legislature’s perception regarding the risks of false claims inherent in the contractual setting.” (Id. at 140-141.)
In this case, there is a lease, signed by both respondents and Mr. Chiofalo. The missing writing is a document signed by Cin-Cin giving Mr. Chiofalo authority to have executed the lease. Ms. Wagner explained that Mr. Chiofalo had managed the building first for her father and then for her, and took care of it entirely. Under the circumstances, it is not surprising that there is no formal contract or even a letter setting out the terms of Mr. Chiofalo’s agency since it is clear that the parties to the agreement had a long-standing practice and all knew the scope of Mr. Chiofalo’s responsibilities. Moreover, I find that the contract and the rent roll, which were both executed by Ms. Wagner on behalf of Cin-Cin, each constitute a writing, signed by the party to be charged, which together are adequate to evidence the agreement between Cin-Cin and Mr. Chiofalo. Both the contract and the rent roll make reference to a lease for respondents. Ms. Wagner testified that she turned over the respondents’ lease to petitioner at the closing. Mr. Ross acknowledged that he had a copy of the respondents’ lease, and that he showed it to respondents at his meeting with them in January 2003. Consequently, I find that these documents, signed by Ms. Wagner, when viewed in the context of the facts and circumstances of the case, demonstrate that there was an agreement between Ms. Wagner, on behalf of Cin-Cin, and Mr. Chiofalo giving him authority to execute leases on behalf of Cin-Cin.[3] Accordingly, I find that the lease is not barred by the statute of frauds.
*846 Even if the contract and rent roll had not been sufficient to prove a grant of authority by Cin-Cin to Mr. Chiofalo, the court would still find that the lease is enforceable because it was ratified by Cin-Cin.
“Ratification is the express or implied adoption of the acts of another by one for whom the other assumes to be acting, but without authority!!,] . . . [and it] relates back and supplies original authority to execute [an agreement]” (Holm v C.M.P. Sheet Metal, 89 AD2d 229, 232 [1982]). Ratification requires “full knowledge of the material facts relating to the transaction, and the assent must be clearly established and may not be inferred from doubtful or equivocal acts or language” (id. at 233; Rocky Point Props. v Sear-Brown Group, 295 AD2d 911, 913 [4th Dept 2002]). “[E]quity will not countenance a ritualistic invocation of the Statute of Frauds, especially where the party claiming its protection has acquiesced in and profited from the very agreement it now seeks to abjure.” (Brockport Devs. v 47 Ely Corp., 82 Misc 2d 310, 315 [Sup Ct, Monroe County 1975].) The court should be focused on determining whether the facts and circumstances establish the principal’s intent to adopt the document (Koch v Regan, 272 App Div 920 [2d Dept 1947], affd 297 NY 644 [1947]). A lessor’s acknowledgment of a lease which was not reduced to writing may render it enforceable. (Club Chain of Manhattan v Christopher & Seventh Gourmet, 74 AD2d 277, 281 [1st Dept 1980]; Tuttle, Pendelton & Gelston v Dronart Realty Corp., 90 AD2d 830, 831 [2d Dept 1982].) A lease which is attacked under the statute of frauds may be ratified by the principal by acts such as permitting the tenant to take possession and then accepting rent, or by a written ratification. (Siemers v Heuchel, 109 Misc 323, 324 [Sup Ct, Kings County 1919]; see also Trepel v Sendrovitz, 119 NYS2d 374 [Sup Ct, Kings County 1952].)[4] The court finds that both were present here.
As petitioner concedes, Ms. Wagner had the power to ratify the lease, and the court finds that she did so. Ms. Wagner testi *847 fied that she learned of the lease in the summer of 2002. As soon as she learned about it, she told Mr. Ross about it, and told him that she would honor it. Moreover, she continued to accept rent under it.[5] She promptly sent Mr. Ross the set up sheet, which stated that the rent for the store was $1,900, the amount set out in the rider, and directed Mr. Ross’ attention to the rider, which she faxed to him with the set up sheet. At the closing, Ms. Wagner executed the contract and the rent roll which both explicitly refer to respondents’ lease. In addition, at the closing, she provided Mr. Ross with a copy of the lease, including the rider. The court holds that, by executing those documents and by her conduct, Ms. Wagner ratified the lease.[6]
This case is thus identical to Appelbaum v Galewski (34 Misc 281 [Sup Ct, NY County 1901]). In that case, the purchaser of the property claimed that it was not bound by a lease signed by an agent for the prior owner who did not have written authority. The court held that the sale of the property constituted a ratification of the lease. The same result must obtain here.
Both parties rely on Holm v C.M.P. Sheet Metal (89 AD2d 229 [4th Dept 1982]) to support their respective positions. In that case, the purchaser of the property challenged a lease executed by an individual who lacked written authority to act on behalf of the corporate lessor. The Court refused to find that the corporate lessor had ratified the lease. However, in that case, the only evidence supporting the claim that the lease had been ratified was the receipt of two months’ rent by the agent. There was no evidence that the corporation became aware of the lease before it sold the property. That is in stunning contrast to this case where Ms. Wagner acknowledged knowing about the lease as of the summer of 2002, orally ratified it to Mr. Ross at that *848 time, took no steps to disavow it, faxed a copy of it to Mr. Ross in October 2002 with the set up sheet, and gave him a copy of the lease at the closing, together with the contract of sale and rent roll, which explicitly referred to it. Consequently, the court finds that the decision in Holm supports respondents’ position.
Since Cin-Cin ratified the lease, petitioner, as its transferee and successor-in-interest, is bound by it.
Finally, petitioner is bound by the lease because it accepted attornment from respondents.
“It is well settled in this State that where a lease was originally invalid for want of title in the lessor, and a subsequent purchaser or the holder of the true title accepts attornment from the lessee under the invalid lease, with knowledge of the terms and conditions of the lease, he validates the lease.” (Anderson v Conner, 43 MisC 384, 388 [App Term, 1st Dept 1904]; see also Ehrlich v Hollingshead, 275 App Div 742, 742-743 [4th Dept 1949]; United Realty & Mtge. Co. v Stoothoff, 133 App Div 245, 246 [2d Dept 1909].)
That is precisely what happened here. With the lease in hand, Mr. Ross called and then met with the respondents in January 2003 to demand that they pay their arrears. In his taped conversations with them, Mr. Ross never repudiated the lease; rather, he repeatedly told Mr. Depierro that he was bound by it. Petitioner then accepted respondents’ rent for over a year before commencing this action. Thus, the circumstances of this case are totally different from those in Holm where the Court refused to find an attornment. In that case, within one month of taking title and after accepting only one month’s rent, the new landlord sent the tenant a letter terminating its tenancy. Here, in contrast, petitioner accepted rent for almost a year before taking any steps to terminate respondents’ tenancy. Moreover, during that year, petitioner increased their rent to the amount set out in the lease. There is also no question that petitioner took title subject to the lease, knew the terms of the lease and was aware that Cin-Cin had been accepting the rent under the lease. (See International Chimney Corp. v 26 W. Spring St. Assoc., 167 AD2d 816, 817 [4th Dept 1990].)
Therefore, the court finds that petitioner accepted attornment of the lease from respondents and is bound by it.
*849 Conclusion
The lease between respondents and Cin-Cin is enforceable against petitioner. The rider was signed by Mr. Chiofalo, and his authority to sign it was in writing; or, alternatively, was ratified by Cin-Cin, and then by petitioner. Accordingly, the proceeding is dismissed.

. Only one of the cases cited by respondent, City of New York v Turnpike Dev. Corp. (36 Misc 2d 704 [Sup Ct, Kings County 1962]), actually supports respondents’ position, but the court declines to follow it, in view of the Court of Appeals decision in Commission and the similar cases cited above. The other cases cited by respondents do not support their position, as they involved unsuccessful attempts to raise the statute of frauds by a party which was either not a true successor in interest to either party to the contract (Gracie Tower Realty Assoc. v Danos Floral Co., 142 Misc 2d 920 [Civ Ct, NY County 1989]), or a total stranger to the contract (Kaminsky v Abrams, 51 Misc 2d 5 [Sup Ct, NY County 1965]; Brooklyn Union Gas Co. v MacGregor’s Custom Coach, 122 Misc 2d 287 [Civ Ct, Kings County 1983]).

. Since the form document and the rider together set out all of the essential terms of the lease, this case is distinguishable from Gotham Food Group Enters. v Principal Mut. Life Ins. Co. (267 AD2d 48 [1st Dept 1999]), cited by petitioner at argument, because in that case, the statute of frauds was held to be a bar to a concededly oral lease where the parties had not even reached agreement on the essential terms.

. There are no circumstances in this case which suggest that Mr. Chiofalo’s execution of the lease with respondents was fraudulent or in any way inconsistent with his prior practice. This contrasts sharply with Commission on Ecumenical Mission & Relations of United Presbyt. Church v Roger Gray, Ltd. (27 NY2d 457 [1971]), where the Court pointed out several facts which raised questions about the bona tides of the alleged lease extension (id. at 466).

. Petitioner contends that the absence of written authorization renders the lease void, with the result that it can only be ratified by a written instrument. However, the law in this department appears to be that agreements which run afoul of the statute are voidable, rather than void. (See, e.g., Dante v 310 Assoc., 121 AD2d 332, 334 [1st Dept 1986], lv denied 68 NY2d 607 [1986]; Felicie, Inc. v Leibovitz, 67 AD2d 656 [1st Dept 1979] [the cases to the contrary cited by petitioner are either from other departments or quite old].) Even more strikingly, the cases petitioner cites for the proposition that the lease must be ratified in writing are all more than 90 years old; more modern cases do not require that. (See, e.g., Holm v C.M.P. Sheet Metal, 89 AD2d 229 *847 [4th Dept 1982]; Rocky Point Props. v Sear-Brown Group, 295 AD2d 911, 913 [4th Dept 2002].) In any event, as shown below, the court finds that Ms. Wagner ratified the lease both in writing and by her acts.

. The court disagrees with petitioner’s argument in its brief that there is no evidence that Ms. Wagner benefitted from the lease after learning of it. Respondents owed $4,200 in rent arrears at the time of the closing. Since their rent was $1,900 per month, they were in arrears for December, January and part of November. Consequently, Ms. Wagner had the benefit of their rents, under the lease, from the summer through mid-November.

. Although petitioner argues that Ms. Wagner could only ratify the lease by reexecuting and redelivering the lease with her signature before she conveyed the deed, he cites no support for this proposition except for Jaffe v Gordon (240 AD2d 232 [1st Dept 1997]) which says no such thing, but merely states the general proposition that a lease must be delivered in order to be enforceable.